IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

ROHN M. DICKERSON,

    Plaintiff,

       v.

MACK TRUCKS, INC., *et al.*,

    Defendants.

\*

\*

\*

\*

CIVIL NO.: WDQ-12-2593

\*

\*

\*

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

MEMORANDUM OPINION

Rohn M. Dickerson sued Mack Trucks, Inc. ("Mack Trucks"), Volvo Group North America, LLC ("Volvo"), (collectively, the "Defendants") and others,[1] for employment discrimination. Pending are the parties' cross motions for summary judgment, the Defendants' motion for leave to file a surreply, and the Plaintiff's motion for leave to file a surreply.  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2014).  For the following reasons, the Defendants' motion for summary judgment will be granted in part and denied in part; the Plaintiff's motion for summary judgment will be denied; the motions for leave to file surreplies will be granted.

---

[1] Mack Trucks and Volvo are the only remaining defendants.  On November 26, 2012, Dickerson voluntarily dismissed the United Auto Workers and UAW Local 2301.  ECF No. 18.  On November 13, 2012, Dickerson, Mack Trucks, and Volvo stipulated to the dismissal of Volvo Parts North America, LLC, which is not an entity.  ECF No. 11.

I.   Background[2]

In September 2005, Mack Trucks hired Dickerson--an African-American male--to work as a "Parts Selector" at the Baltimore Distribution Center.  ECF No. 53-13 ("Dickerson Dep.") at 56:1. On February 12, 2008, Dickerson was terminated, allegedly for violating the Defendants' Attendance Policy.  *See* ECF No. 51-11.

A.   The 2004 Attendance Policy

Under the terms of their labor agreement, the Defendants negotiated with the United Auto Workers ("UAW") to implement a new attendance policy for the employees at the Baltimore Distribution Center.  ECF No. 51-2 ("Keelan Dep.") at 25:1-21. The policy which became effective on October 2, 2004, outlined five disciplinary steps--starting with a spoken reminder and ending with discharge-- which would occur if employees were consistently absent.  *See* ECF No. 51-5 at 3 (2004 Attendance Policy).  Under the section titled "Excused Absences," the policy states:

---

[2] The facts are taken from the complaint (ECF No. 1), the Defendants' motion for summary judgment (ECF No. 51), Dickerson's cross-motion (ECF No. 53), the Defendants' reply (ECF No. 55), Dickerson's reply (ECF No. 57), and their supporting exhibits.  When cross motions for summary judgment are filed, "each motion must be considered individually, and the facts relevant to each must be reviewed in the light most favorable to the nonmovant."  *Mellen*, 327 F.3d at 363 (*citing Rossignol v. Voohaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

2

Absences will be excused if documentation to verify the reason for the absence is presented to the Company immediately upon the employee's return.   Failure to present this documentation upon return makes these absences unacceptable and they will be counted as occurrences [toward discipline].   Considerations will be given for a delay in providing such documentation, provided the employee submits a reasonable excuse for such delay.

*Id.*  Following this paragraph, the policy lists the requirements for doctor's notes written to excuse an employee's absence:

a.   The employee must actually be seen by a physician or physician's assistant.   The employee may not call or fax in a request for a note.

b.   Regularly scheduled appointments such as, physicals, routine dental, vison, or hearing examinations will not be excused under this policy.

c.   No backdating of notes by [a] physician or his/her representative will be allowed.

d.   The employee must make an attempt to see the physician the first day of his/her illness.   If an appointment cannot be secured, the employee is to notify HR so that Cigna may be contacted to get involved in securing an appointment . . . .

*Id.*

The Defendants assert that doctor's notes under the attendance policy must also include a doctor's notation of when the employee cannot work, and include the phrase "unable to work." *See* ECF No. 51-2 at 3.  In support, the Defendants claim that a policy by the corporate doctor, Jeffrey Burtaine, M.D., was posted on bulletin boards, advising that "a doctor's note

3

should indicate that the employee is unable to work."[3]  *See id.*;
Keelan Dep. 94:1-98:15.

Despite the Defendants' assertions, there appears to have
been some confusion at the Baltimore Distribution Center about
what was required in doctor's notes.  For example, on January
28, 2008--three years after the implementation of the Attendance
Policy and only the day before the absence that would lead to
Dickerson's termination--the president of the local UAW chapter
sent an email indicating that he and Thomas Keelan, the Plant
Manager, had been arguing over the doctor's note language
requirements.  *See* ECF No. 53-7.  Further, Matthew Lopez,
Dickerson's supervisor, testified that he was not aware of any
policy requiring the exact phrase "unable to work" on a doctor's
note.  *See* ECF No. 51-7 ("Lopez Aff.") at ¶¶ 11-15 ("It was

---

[3] The Defendants cited no document stating that the exact phrase
"unable to work" was required.  *See* ECF No. 51-2 at 3.  For
example, in a memorandum to all employees on March 5, 2002,
Thomas Keelan, the Plant Manager, stated:

> Basically, the note will need to include enough
> information for your Supervisor to make a decision on
> your request to excuse the time missed. At a minimum,
> the note will need to have the doctor's name; if the
> signature is not legible, please write the doctor's
> name on the note. Include the doctor's phone number
> and time of appointment, if relevant. If you are
> unable to work, the note must state the period of time
> you were unable to work.

ECF No. 53-7.

acceptable for notes to state the date an employee was able to return to work . . . .").

B.  The Plaintiff's Termination

Between being hired in 2005 and January 2008, Dickerson had advanced to the fourth level of discipline under the 2004 Attendance Policy. *See* ECF No. 51-2 at 7.  "[A]s of January 28, 2008, Plaintiff had accrued 2.75 occurrences for the month of January and was .25 of an occurrence away from termination." *Id*.

On January 27, 2008, Dickerson began to feel ill at work. Dickerson Dep. at 108-110.  Dickerson immediately went to Mercy Medical Hospital's emergency room and was diagnosed with an upper-respiratory infection. *See* ECF No. 53-14 at 3 (Discharge Instruction).  Dickerson obtained a "Work Release Form" from Mercy which included the time and date of his ER visit, and the name of the doctor. *Id*.  The form also stated that Dickerson "may return to work on 1/31/08;" however, 1/31/08 was crossed out and 02/02/08 was added with a nurse's initials. *Id*.  "On January 30, 2008, Plaintiff called Sherrie Williams, Manager of Payroll and Administration at the Baltimore Parts Distribution Center, to provide his status after leaving work early the previous day." ECF No. 51-2 at 7.  He informed Williams that he intended to see his primary care physician on January 31, 2008.

5

*Id.*  On January 31, 2008, Mercy faxed the Defendants a copy of Dickerson's prescriptions and his discharge documents.  ECF No. 53-2 at 11.

Also on January 31, 2008, "Dickerson was seen by his primary-care physician, Dr. Anthony Harrell, M.D., for his continued illness."  ECF No. 53-2 at 11.  Dr. Harrell wrote a note stating that Dickerson was "under his care" from January 31 to February 5, 2008.  *See* ECF No. 53-14.

On February 5, 2008, Dickerson returned to work and provided Williams with Dr. Harrell's note and Mercy's paperwork. ECF No. 51-2 at 8.  When the documents were reviewed by Lopez, Dickerson's supervisor, he was going to mark the absences as excused, but was told by Keelan that he must mark the notes "unexcused" and "unexcused pending review."  *See* ECF No. 51-7. Williams called Mercy and asked about the crossed out date on Mercy's Work Release Form.  *Id.*  "The nurse confirmed the change and added that, because of Plaintiff's occupation as a truck driver, the ER nurse had changed his return to work date."  *Id.* Because the Defendants felt that Dickerson had lied,[4] "Williams relied on the initial return to work date of January 31, 2008 and [only] excused Plaintiff's absence on January 30."  *Id.*

---

[4] Dickerson asserts that he told the nurse that he drove a "fork truck" or cherry-picker, which is undisputedly part of his job. *See* ECF No. 53-2 at 13.

Later, Dickerson submitted more notes from Dr. Harrell explaining Dickerson's absences from January 31 to February 4, 2008.  On February 6, 2008, Dr. Harrell signed a note stating that "[a]s of 02/05/2008, [Dickerson] may return to full work status."  *Id.*  However, the note mistakenly stated that Dickerson was seen by Dr. Harrell on February 2, 2008 rather than January 31, 2008.  *Id.*  Keelan marked the note "Not Excused Pending Review" with his signature.  ECF No. 53-14.

On February 12, 2008, Dr. Harrell wrote another note clarifying the mistake in the previous letter, stating that Dickerson was "seen on 1/31/08 for follow-up of [an upper respiratory infection].  [H]e was under our care and out of work from 2/1/08 thru 2/4/08."  ECF No. 53-14.  The note also stated, "As of 02/05/2008, he may return to full work status."  *Id.*  Dickerson was informed by Keelan that the note was unacceptable.  ECF No. 53-2 at 14.

Dickerson also attempted to fill out and submit an "Accident & Sickness Packet" to the Defendants.  *See* ECF No. 53-2 at 11-12.  Williams provided the packet to Dickerson on January 30, 2008.  *Id.*  On February 7, 2008, the packet was sent to the Defendants.  *Id.* at 14.  Included was another note from Dr. Harrell which stated that Dickerson was seen on January 31, 2008, was in Dr. Harrell's care until February 5, 2008, and

7

could return to work as of February 6, 2008.  ECF No. 53-14.

The packet was marked "Unexcused pending."  *Id*.  The Defendants

assert that "[b]ecause all of the [doctor's] notes and paperwork

conflicted and none of the notes or paperwork covered

[Dickerson's] January 31 absence, [] Keelan determined that the

January 31 absence was not covered under the 2004 Attendance

Policy."  ECF No. 51-2 at 10-11.  However, in their interrogatory

responses, the Defendants stated

> The February 12 note provided for a return to work
> date of February 5.  Dr. Harrell's earlier note
> provided a return to work date of February 6, 2008.
> Since Plaintiff actually returned to work on February
> 5 in accordance with the instructions in Dr.
> Harrell's most recent note, *Defendants determined the
> February 12 note to be the most accurate*.  However,
> the February 12 note did not cover Plaintiffs January
> 31 absence.  Accordingly, Plaintiffs January 31
> absence was not excused and Plaintiff reached 3.75
> occurrences in January, making him eligible for
> termination.

ECF No. 53-17 (emphasis added).[5]  Further, in his deposition,

Keelan states that the doctor's notes were rejected because they

did not include the phrase "unable to work."  *See* Keelan Dep. at

73:1-75:21.

On February 12, 2008, Dickerson was terminated, for

violating the Defendants' Attendance Policy.  *See* ECF No. 51-11.

---

[5] Dickerson argues that the Defendants chose the February 12,
2008 note because it was the only one which did not cover his
January 31, 2008 absence.  *See* ECF No. 53-2 at 17.

C.   The Defendants' Discriminatory Animus and Alleged
     Inconsistent Enforcement of the Doctor's Note Policy

Dickerson asserts that the doctor's note requirements of

the 2004 Attendance Policy were enforced differently for white

and female employees.  Dickerson provides fifteen notes from

other employees which did not include the "unable to work"

phrase, but were accepted and marked as excused.[6]  *See* ECF No.

53-2 at 7-8.  Dickerson also cites excused medical absences by

white employees that were not supported by any doctor's note.[7]

*See id.* at 9.

According to Lopez, not only did Keelan tell Lopez to

reject Dickerson's notes even though Lopez was unaware of any

policy requiring "unable to work" in a doctor's note, but

_____

[6] The Defendants argue that these notes either comply with the
Attendance Policy or were not evaluated under the Attendance
Policy because they were Worker's Compensation notes.  *See* ECF
No. 55 at 13-18.  During Keelan's deposition, however, he stated
that documentation for Worker's Compensation absences were kept
in a separate file not produced to Dickerson.  Keelan Dep. at
154-158.  This is an issue of fact that the Court cannot resolve
on a motion for summary judgment.

The Defendants also cite a few notes that were submitted by
a white female employee but were rejected under the policy.  ECF
No. 51-2 at 14.

[7] Although many of these absences were approved by supervisors
and not Keelan, Dickerson argues that Keelan purposefully
interfered with the approval of Dickerson's notes, and rejected
the notes as insufficient because of Dickerson's race.  *See* ECF
No. 57 at 12 ("[W]ith white employees, Keelan had a hand[s]-off
policy and would-enable supervisors of white employees to
independently exercise their supervisory duties and accept or
reject submitted doctors' notes . . . .")

9

"Keelan [also] advised [him] on several occasions that [Keelan]
wanted to terminate [] Dickerson's employment and that [Lopez]
was to find a way to terminate his employment." ECF No. 51-7.
Moreover, according to Lopez, doctor's notes similar to
Dickerson's which were submitted by white employees were
accepted. *Id.*

Lopez's affidavit corresponds to the affidavit of Erik
White, an African American employee at the Baltimore
Distribution Center. ECF No. 57-2. According to White, the
Defendants built a hostile work environment in which African
American employees were treated differently than white
employees, and Keelan would "single out, harass, intimidate and
instill fear in black employees." *Id.*[8] White also recounts an
instance in which he submitted a doctor's note to excuse an
absence, but Keelan rejected the note because it was "bogus" and
was allegedly backdated.[9] *Id.*

---

[8] According to Dickerson, three years before his termination,
Keelan made a racist comment to him. When Dickerson was unable
to reach a piece of equipment on a shelf, Keelan stated, "Why
don't you climb like a monkey? I'm sure then that you could
reach it." Dickerson Dep. at 56.

[9] Dickerson also provides the employment file of an African
American employee at the Defendants' Elkton location terminated
in 2007 for violating the attendance policy. The employee
submitted doctor's notes similar to Dickerson's, and the notes
were rejected. *See* ECF No. 53-2 at 19. However, this incident
occurred at a different facility and did not involve Keelan.
*See id.*

Dickerson also cites statistics in support of his discriminatory animus argument. *See* ECF No. 53-2 at 2-3. The facility at which Dickerson worked employed approximately 100 to 150 people from 2005-2009. *Id.* Only 15-16 of these employees were African American, which is not representative of Baltimore's working populous.[10] *Id.* The Defendants allegedly terminated nine employees between 2005 and 2009, five of the nine employees were African American, although only 10-16% of the Defendants' workforce were African-American. *Id.*

D.   Procedural History

On July 24, 2009, Dickerson filed a formal charge of discrimination with the Equal Employment Opportunity Commission. ECF No. 1 at ¶ 2; ECF No. 13-2. On May 31, 2012, the EEOC mailed a right to sue letter, which Dickerson received on June 6, 2012. ECF No. 1 ¶ 3; ECF No. 1-1. On August 29, 2012, Dickerson sued the Defendants alleging race and gender discrimination in violation of Title VII of the Civil Rights Act

---

[10] The Defendants argue that these statistics should not be considered. First, the population numbers for the work force were not from official documents, but from Keelan's deposition and White's affidavit. Second, comparing the racial make-up of the Defendant's facility to Baltimore is misleading because not all of the populace is "qualified". *See* ECF No. 55 at 4-6. Dickerson responds that the Defendants have not cited any unique qualifications that separate the Defendants' employees from the general working populace of Baltimore. *See* ECF No. 57 at 4.

11

of 1964[11] ("Title VII"), and age discrimination in violation of the Age Discrimination in Employment Act of 1967[12] ("ADEA").[13]

On September 15, 2014, the Defendants moved for summary judgment on all remaining claims.  ECF No. 51.  On September 29, 2014, Dickerson filed a cross motion for summary judgment on his race discrimination claim.  ECF No. 53.  On October 13, 2014, the Defendants replied.  ECF No. 55.  On October 28, 2014, Dickerson filed his reply.  ECF No. 57.  On November , 12, 2014, the Defendants moved for leave to file a surreply to address the affidavit of Erik White.  ECF No. 58.  On December 1, 2014, Dickerson moved for leave to reply to the Defendants' arguments about White.  ECF No. 61.  The surreply motions were unopposed.[14]

II.  Analysis

A.  Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

---

[11] 42 U.S.C. §§ 2000e *et seq.*

[12] 29 U.S.C. §§ 621 *et seq.*

[13] Dickerson alleged several other causes of action related to his termination; however, the Court dismissed those claims on July 10, 2013.  *See* ECF Nos. 25-26.

[14] Dickerson attached White's affidavit for the first time to his reply.  The proposed surreplies argue the validity and weight of White's affidavit.  Because White's affidavit was new evidence presented for the first time in a reply, the Court will grant the motions for leave to file surreplies.

movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a).[15]  In considering the motion, the judge's function
is "not . . . to weigh the evidence and determine the truth of
the matter but to determine whether there is a genuine issue for
trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249
(1986).  A dispute about a material fact is genuine "if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most
favorable to . . . the nonmovant and draw all reasonable
inferences in [its] favor," *Dennis v. Columbia Colleton Med.
Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court
must abide by the "affirmative obligation of the trial judge to
prevent factually unsupported claims and defenses from
proceeding to trial," *Bouchat v. Balt. Ravens Football Club,
Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal
quotation marks omitted).

When cross motions for summary judgment are filed, "each
motion must be considered individually, and the facts relevant
to each must be reviewed in the light most favorable to the

---

[15] Rule 56(a), which "carries forward the summary-judgment stan-
dard expressed in former subdivision (c)," changed "genuine
'issue' [to] genuine 'dispute,'" and restored the word "'shall'
. . . to express the direction to grant summary judgment."  Fed.
R. Civ. P. 56 advisory committee's note.

nonmovant." *Mellen*, 327 F.3d at 363 (*citing Rossignol v. Voohaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

    B.   Methods of Proving Discrimination

    A plaintiff can prove his employer's discrimination through one of two methods. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004).

    First, a plaintiff may use "any direct or indirect evidence relevant to and sufficiently probative of the issue," under "ordinary principles of proof." *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (internal quotation marks omitted). The plaintiff must produce "direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (internal quotation marks omitted).

    Absent direct evidence of discrimination, the Court applies the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). If he does, "a presumption of illegal discrimination" arises, and the burden of production shifts to

14

the employer to articulate a nondiscriminatory reason for its
adverse decision. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336
(4th Cir. 2011).

"If the defendant carries this burden of production, the
presumption raised by the *prima facie* case is rebutted," *Tex.
Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981), and
the *McDonnell Douglas* framework "drops out of the picture." *St.
Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The
plaintiff must then prove by a preponderance of the evidence
that "the proffered reason was not the true reason for the
employment decision," and that the true reason was
discrimination. *Burdine*, 450 U.S. at 256. He may do this
directly or indirectly, by "persuading the court that a
discriminatory reason more likely motivated the employer" or by
showing that the employer's explanation is "unworthy of
credence." *Id.*

C.   Dickerson's Race and Gender Discrimination Claims[16]

To establish a *prima facie* case of employment
discrimination, a plaintiff must show 1) he is a member of a
protected class, 2) he suffered an adverse employment action, 3)
at the time of the action, he was meeting his employer's

---

[16] In his reply, Dickerson conceded that "the evidence does not
support the Count for Age Discrimination . . . ." ECF No. 57 at
2. Accordingly, the Court will grant summary judgment for the
Defendants on the ADEA claim.

legitimate expectations, and 4) he was treated differently from other similarly situated persons who were not members of the protected class. *Pulley v. KPMG Consulting, Inc.*, 348 F. Supp. 2d 388, 394 (D. Md. 2004).

The Defendants assert that "Dickerson fails to meet his burden to establish a prima facie discrimination claim because he is unable to show that other Baltimore Parts Distribution Center employees outside his protected classes received more favorable treatment than he did." ECF No. 51-2 at 22. The Defendants argue that because white and female employees were also subject to discipline under the 2004 Attendance Policy, there is no discrimination. *See id.* at 15-24. Dickerson's argument, however, is not that the 2004 Attendance Policy was not enforced *generally* against white and female employees. Instead, Dickerson argues that the doctor's note policy was enforced differently against African American and male employees so that these individuals were more likely to proceed to the final level of discipline (i.e. termination), while white and female employees were more likely to get excused absences and move back in discipline levels.[17]   *See* ECF No. 53-2 at 7-10.

---

[17] This argument applies regardless of whether the 2004 Attendance Policy truly required the "unable to work" language, and whether Dickerson's notes violated the policy.  If the language was required, and Dickerson's note was somehow insufficient, then there would still be discrimination if white

Dickerson has provided several examples of doctor's notes similar to Dickerson's rejected notes which were submitted by white employees; those notes were accepted and marked as excused. *See* ECF No. 53-2 at 7-8. Dickerson also cited evidence from a supervisor that white employees were treated differently under the doctor's note policy, and provided an example in which Keelan interfered in the doctor's note submissions of another African American employee. *See* ECF Nos. 51-7; 57-2. In contrast, the Defendants cite an instance in which a white female employee's doctor's note was rejected for reasons similar to Dickerson's. *See* ECF No. 51-2 at 14-15. Accordingly, there is a material issue of fact about whether white employees were treated differently under the excused absences provision of the 2004 Attendance Policy.

Having established a *prima facie* case, the burden of production shifts to the Defendants to provide a non-discriminatory reason for Dickerson's termination. *Hoyle*, 650 F.3d at 336. The Defendants carry this burden by asserting that

---

or female employees were not held to this standard. Similarly, there would be evidence of discrimination if the "unable to work" language requirement was only enforced against African American or male employees. Therefore, it is irrelevant for the purpose of this Memorandum Opinion to determine what the 2004 Attendance Policy required and if Dickerson's notes violated the policy.

Dickerson violated the 2004 Attendance Policy and advanced to the final level of discipline.

Dickerson has presented sufficient evidence that the reason provided by the Defendants is "unworthy of credence." *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). The Defendants have been inconsistent about why Dickerson's notes violated the 2004 Attendance Policy. *See*, *e.g.*, *Sears Roebuck*, 243 F.3d at 852-53 ("Indeed, the fact that Sears has offered different justifications at different times . . . is, in and of itself, probative of pretext."). However, "[i]t is not enough . . . to disbelieve the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 146-47. In other words, Dickerson must establish that a reasonable jury could find by a preponderance of the evidence that discriminatory animus was a motivating factor for denying his doctor's notes and his subsequent termination. *See Hill*, 354 F.3d at 297-98.

To carry this burden, Dickerson provided evidence of a "hostile environment" at the Baltimore Parts Distribution Center against African American employees, including the testimony of

White[18] and Lopez, statistics about the Defendants' employment

practices,[19] and Keelan's negative attitudes toward African

---

[18] The Defendants argue that White's testimony about the hostile work environment at the Baltimore Distribution Center is irrelevant because this is not a hostile work environment case. *See* ECF No. 58-2 at 5.  However, evidence of a "discriminatory culture" toward a protected class may be used in a disparate treatment case to show discriminatory animus, and rebut a defendant's non-discriminatory reason for the adverse employment action.  *See Smyth-Riding v. Science and Eng'g Servs., Inc.*, No. WDQ-11-0558, 2014 WL 4899573, at *10-11 (D. Md. Sept. 29, 2014) (evidence of a discriminatory culture toward women was sufficient to avoid summary judgment).

The Defendants also argue that White's affidavit is full of conjecture and hearsay. *See* ECF No. 58-2 at 5.  The Court, however, only relied on the portions of White's affidavit discussing his experiences, not his beliefs about what occurred at meetings or events at which he was not present.

[19] The Defendants argue that the statistics should not be considered because this is not a disparate impact case, and the statistics are misleading. *See* ECF No. 55 at 2.

"In disparate treatment cases, [courts] consider statistical evidence to be 'unquestionably relevant.'" *Carter v. Bell*, 33 F.3d 450, 456 (4th Cir, 1994) (quoting *Ardrey v. UPS,* 798 F.2d 679, 684 (4th Cir.1986)).  "Such evidence may be used to establish an inference of discrimination as an element of plaintiff's *prima facie* case, or to demonstrate that an employer's stated nondiscriminatory reason for its action is in reality a pretext." *Id.* (internal citations omitted).  However, "[t]he usefulness of statistics depends on the surrounding facts and circumstances." *Id.*

Here, Dickerson compares the Defendants' labor pool to the labor pool of Baltimore.  The Defendants have cited no special qualification which would make the "qualified labor pool" smaller. *See Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 307-08 (1977) (statistics should only examine qualified teachers, not the entire unqualified labor pool).  Moreover, Dickerson also uses internal statistics comparing the Defendants' firing percentages to their labor pool.

Although these statistics are not highly probative, and cannot establish pretext on their own, Dickerson has not relied

19

American employees, including an allegedly racist comment by
Keelan toward Dickerson.[20]   A reasonable jury could determine
that Dickerson's race was a motivating factor in his
termination.

Based on this evidence, regardless of whether the Court
views the evidence in a light more favorable to the Defendants
or Dickerson, issues of material fact exist about whether non-
African American employees were treated differently under the
policy and if race was a motivating factor in these decisions.
Accordingly, the Court will deny the cross motions for summary
judgment on the Title VII race discrimination claim.

---

solely on these statistics and had supplied other sufficient
evidence.  The statistics merely support that evidence.

[20] The Defendants argue that this comment is irrelevant because
it was a stray remark that occurred long before Dickerson's
termination.  *See* ECF No. 51-2 at 30.
    "[T]hough [] 'stray remarks' may be material to the pretext
inquiry, their probativeness is circumscribed if they were made
in a situation temporally remote from the date of the employment
decision, or . . . were not related to the employment decision
in question, or were made by nondecisionmakers."  *Straughn v.
Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir. 2001) (quotation
omitted).  Further, "[s]tray remarks made in the workplace are
not sufficient to establish a claim of discrimination." *Simmons
v. Océ-USA, Inc.*, 174 F.3d 913, 915 (8th Cir. 1999).
    Here, Dickerson is not relying on the remark alone, but,
rather, using the remark to reinforce his evidence of the
hostile environment at the Baltimore Distribution Center.
Moreover, the remark was made by the decisionmaker in this case.
Accordingly, the remark is probative in the summary judgment
analysis.

Compared to his race discrimination claim, Dickerson presented very little evidence supporting his allegation of gender discrimination. Dickerson failed to address gender discrimination in his cross motion, and summarily stated in his reply that there was "ample evidence" to support his gender discrimination claim because one female employee's doctor's notes were accepted. *See* ECF No. 57 at 2.

Even if the Court were to consider the evidence of the one female employee sufficient to establish a *prima facie* case of discrimination, Dickerson has provided no evidence on which a reasonable jury could conclude that gender was a motivating factor in his termination. Moreover, the remainder of the doctor's notes cited by Dickerson were submitted by male employees. *See Smyth-Riding v. Science and Eng'g Servs., Inc.*, No. WDQ-11-0558, 2014 WL 4899573, at *8 (D. Md. Sept. 29, 2014) (granting summary judgment because the comparator group included members of the protected class); *Allen v. Dorchester Cnty.*, No. ELH-11-01936, 2013 WL 5442415, at *15 (D. Md. Sept. 30, 2013) ("If plaintiff's comparators are from the same protected class, then any discrepancy in discipline is not attributable to plaintiff's membership in that class.").

Accordingly, the Court will grant summary judgment for the Defendants on the gender discrimination claim.

III. Conclusion

    For the reasons stated above, the Defendants' motion for summary judgment will be granted in part and denied in part; the Plaintiff's motion for summary judgment will be denied; the motions for leave to file surreplies will be granted.


_____9/15/15_____

Date

_____

William D. Quarles, Jr.
United States District Judge